Case number 14-3309, Frederick Calatrello v. DHSC LLC. Oral argument not to exceed 15 minutes per side. Ms. Litzinger for the appellant. Good morning, Your Honors. Good morning. If it pleases the Court, I've asked for two minutes reserved for my rebuttal. Fine. Your Honors, I represent the respondent appellant in this case, Affinity Medical Center. Affinity operates a hospital in Massillon, Ohio. Before I get into the specifics associated with the two issues before the Court this morning, I'd like to give the Court a little bit of background about the circumstances that existed at Affinity in the summer of 2012. In July of 2012, Affinity reached an agreement with the California Nurses Association. That agreement is disputed, its existence in import by the CNA, and it's a matter pending in front of Judge Pearson, the Northern District, under Section 301 action. The facts before this Court, including the record evidence before the District Court, establish that the neutrality agreement in place afforded the California Nurses Association 75 days of neutrality time. It afforded their organizers enhanced access to various aspects of Affinity's facility, including their cafeteria, break rooms, and bulletin boards. The CNA established and dispatched rapid response teams to Affinity. We granted unpaid leave to a nurse who was interested in participating in the organizing campaign. And additionally, Affinity and the CNA had an alternative dispute resolution mechanism in place at the time by which they were able to resolve disputes related to compliance with or construction of the agreement. It is in the context of this environment that Ann Waite came to the attention of Affinity's management. Now, because this is a Section 10J action, in order for relief to be just and proper, this has to be the kind of extraordinary case where, as compared to all of the other cases pending before the Board, the remedial effect of the Board's order is substantially limited. Not just that Ann Waite might be disadvantaged, but that her termination, as compared to all other terminations, is unusual and extraordinary. We believe that the evidence before the Court establishes, one, that no reasonable cause exists to suggest that Affinity violated the National Labor Relations Act when it terminated Ms. Waite's employment, and two, that the award of relief as to Ms. Waite was not just and was not proper. The District Court, Your Honors, relied on two events in his finding of reasonable cause. The first of those events involved a confrontation that Ms. Waite had with the pharmacy director at Affinity, whose name is John Perrone. Mr. Perrone has a duty under the drug discrepancy policy to monitor Pyxis machines. A Pyxis machine is effectively a security mechanism whereby those with the authority to retrieve prescribed, controlled substances enter a code that indicates their name, and then the number of pills or doses is dispersed to that health care provider. You're getting us into a lot of very detailed facts, which are in the record, but what is our standard of review here? Are we supposed to be deciding de novo these various facts, or aren't we supposed to give deference to the decisions in the administrative context? Well, there's no deference to the administrative context at this, to the administrative process at this level. Your standard of review is whether or not the District Court's finding of reasonable cause on the facts constitutes clear error. And what was the District Judge's standard to make that determination? The District Judge's standard is whether or not there's reasonable cause to believe that an unfair labor practice violation occurred and that the relief requested by the petition for injunctive relief is that the relief itself is just and proper. It's a fairly low threshold. We've acknowledged that in our pleadings. But when you look at the facts, the evidence that was before the administrative law judge, the clear error of the District Court is apparent. Mr. Perrone discovered that there were Percocet pills missing from the Pyxis on that day, and he approached Nurse Waite, who was the last person to access that machine, and asked for her assistance in reconciling the difference. And she said to him in a rude and unprofessional tone, I am too busy. Didn't she apologize later on to him for her actions? She did later on. Within the same day? I think, Your Honor, it was actually the next day. But it was prior to the time that the written warning issued. The written warning memorialized the offenses at issue. Ms. Waite was rude and unprofessional. She demonstrated a poor attitude. So does the record show that other people were terminated for similar conduct? Not for rudeness or poor attitude. This was not Ms. Waite's only offense during the relevant time period. It is one of the two events that the District Court relied upon. And this event occurred, was it the same week as the union issue was developing? The election, Your Honor, I believe was the 29th of August. This event occurred on the 30th of August. She was terminated what day? September 26th, prior to the time that the union was certified. The initial results of the election showed a fairly close vote, about 100 votes yes and 97 votes no. There were some objections and challenges tendered to the election. Those were ultimately resolved, and the regional director certified the CNA as the collective bargaining representative. Excuse me. What date was that? October 5th, Your Honor. So it's nearly a month after. All right. So she's guilty of being rude and showing poor attitude, but she doesn't have any history of being disciplined. So you certainly don't terminate her for being rude. Well, that was not her only offense, Your Honor. I know. I'm trying to figure out what else is involved. Okay. I'll progress right to that. All right. On August 28th of 2012, an elderly patient was admitted to the emergency department. She had fallen and fractured her hip. She was in the emergency department for a relatively short period of time, at which point she was transferred to the orthopedics department where Ann Waite worked. Ann Waite admitted under oath in testifying before the administrative law judge that that patient was her responsibility. She never delegated responsibility to another person, and as a result she had four critical things that she was supposed to do with Mrs. P, as she's referred to in the record. One, she had to conduct a head-to-toe assessment. That's a baseline determination of some fairly critical bodily functions, pulmonary, cardiovascular, gastrointestinal. Again, we're getting ourselves into a lot of details on the facts, and we have read the materials in the briefs and the record and know that the nurse did not apparently do a skin assessment. So this was a concern. But again, my question would be, were other people who had stellar records except for one incident of rudeness and one incident of failing to look at the skin of the patient and do a few other little things, which I agree are serious things for a nurse to do, were other nurses fired? I'll answer that question, Your Honor, in the testimony, unequivocal and uncontradicted, of William Osterman, who was the chief nursing officer at Affinity at the time. During his tenure in the position of chief nursing officer, he had never seen offenses as grave as those that Ms. Waite committed on August 28th. Those meaning the one dealing with the patient, Mrs. P? That's correct. In addition to the failure to do the skin assessment, the failure to do the head-to-toe assessment, the failure to do hourly rounding, and the subsequent falsification of the medical records for Ms. P. Wasn't there testimony by someone, and I'm sorry I don't remember the name, where this supervisor, when hearing of the plan to ultimately determinate Ms. Waite, said that this was a very thin case, and I'm making those words my own, but that it was an extremely thin case and she was surprised or he was surprised that the hospital was considering terminating Ms. Waite? I don't believe that that was the testimony, Your Honor. What I believe is the initial review was, is there enough to go forward and what is the level of investigation to which Affinity should commit itself in evaluating the circumstances? And part and parcel of the clear error that is demonstrated in the district court's finding of reasonable cause turns on this component. The two persons who were ultimately responsible for reviewing the record, Patricia Klein, who's an RN and also the compliance officer, and the HR professional whose name is Angela Boyd, neither of them had any knowledge, according to the evidence presented, that Ms. Waite engaged in any protected union activity whatsoever. So we have this absence of connectivity between Ms. Waite's alleged protected activity and her termination. Wasn't her picture on the front of the brochure that they were handing out? Your Honor, there's no evidence that either of those people received a copy of this brochure, and I'd like to point out as well that Ms. Waite... Wasn't that pushing it a little far? I mean, they could have seen it. They could have passed by a desk where it was lying. They could have, and that evidence could have been adduced, but it was not. Oh, impossible. They go by a desk, a nurse's station desk, and see it lying on the desk, recognize the picture, there's nobody else there. How are you going to prove something like that? There's 33 other photographs on that brochure, Your Honor. Okay. So she stands as one of a class of people, one of a hundred. Right. So the failure to do the skin test and some other things, I'm looking at a list of people, nurses, who engaged in infractions at least as serious as what Ms. Waite did, and many of them more serious, and they got verbal counseling, they got written warnings. There's an S.F. who on the same day that Zinzmeister and McDonald first met with Waite, she was given verbal counseling for failing to complete a chart, resulting in an infusion drip that should have been infusing continuously, and instead it was left off for 12 hours. The infusion drip was in place to control the rhythm of the patient's heart, and this, quote, serious medication error was of the sort that, quote, can result in patient harm up to and including death, and that person was verbally counseled and didn't even get a written warning? That's correct, Your Honor, and the distinguishing factor in that case is that there was an error. There was not falsification. In this case, when Nafinity sat down with Nurse Waite and said, we are auditing the medical file, the medical records of Ms. P., we'd like to walk through these with you, are they true and accurate, and she said, the medical record is a fact. They walked her through each of the entries, which subsequently we know not to be true, and she initialed them as true. It wasn't until several weeks later where everyone finally realized, including Ms. Waite and her union representatives, that this was very serious. Then she decided that she didn't perform the head-to-toe assessment at 9 a.m. before the patient was even admitted to her department. She performed it at 11. She made no correction to the medical record, nothing to indicate that that was true, and the sitter, Rhonda Smith, who was in the room at the time at 11, said she never touched the patient, never. Well, there was contrary evidence on that, too. I'm just wondering if this wasn't, given this sterling record that this nurse had, one of those situations where you take some interim step before you terminate her. I mean, that's how it stacks up against these other files that we have in the record. Your Honor, an employer has no obligation to take an interim step prior to the time that the union is certified and prior to the time that a collective bargaining agreement exists. Well, when they're in the middle of this situation, it sure would be safer to do that, wouldn't it? I wouldn't be here today, I suspect, if that had been done. I notice that my time is drawing to a close. I have reserved, as I indicated, two minutes for rebuttal. Thank you, Your Honor. Thank you. Good morning. May it please the Court, my name is James Congrella and I represent Regional Director Calatrello of the 8th Region of the National Labor Relations Board. The District Court correctly found that interim relief was just and proper under Section 10J to prevent irreparable harm to Affinity's employees' rights. There is ample evidence to support the District Court's conclusion that Affinity disciplined and terminated known union supporter Ann Waite in retaliation for her prominent and well-known support of the union during the organization campaign. A couple quick points responding to Appellant's opening argument. The first is that, as Your Honor has correctly pointed out, there is conflicting evidence on the head-to-toe assessment. On the one hand, there's Waite's account of the morning in which while a substitute sitter, who was actually in the room at 11, not Ms. Smith, Ms. Lesjack, went to the bathroom and during that time Ms. Waite performed the head-to-toe assessment. Additionally, the principal reason that according to, I believe it was Mr. Osterman's testimony, that the decision to terminate Ms. Waite based on the patient care incident was made was for two reasons. Failure to do a head-to-toe assessment and then misdocumenting it. And your opponent has characterized that as falsification, i.e. fraud, which presumably is a serious and different offense than simply failing to do something, even a critical something. So how do you respond to that? That the reason why she was fired was because of falsification, a.k.a. fraud? There are only three elements were actually incorrect that have been demonstrably, by unconverted evidence, been demonstrated as incorrect on Mrs. P's chart. The fact that rounding occurred at 7, 8, and 9 a.m. prior to the time she was even in the orthopedic ward when she was still in the emergency department. And the fact that the head-to-toe assessment was done at 9 a.m. as opposed to 11 a.m. It's uncontested that at the time when Mrs. P was admitted into the orthopedic ward, she took up the last bed. The orthopedic ward was admittedly very busy that day, and I believe there is testimony in the record as to the fact that Ms. Waite didn't actually fill out the patient's chart until the conclusion of her shift. Well, but my understanding of your opponent's argument here is that the real problem is that when Ms. Waite was given the chance to go through the patient's record step by step, Ms. Waite signed her initials by various events in that medical record,  and if that's what her argument is, how do you respond? I think that's certainly a characterization of the events. I think a better characterization is to put this in the context of when it happened. It happened immediately after Ms. Waite was disciplined for her interaction on August 30th with Pharmacy Director Perrone. She was brought in, informed of her written warning for that incident, and then immediately by, I believe it was Zinmeister and McDonald, asked to go through the chart with them. At that time, she was not given any context as to why they were doing it, and the only things that she initialed that were falsified or incorrect, however you choose to characterize them, was the fact that rounding occurred at three times before Mrs. P. was even in the orthopedic department and at the time the head-to-toe assessment occurred. And I think that's the thing to remember is that Affinity has never demonstrated conclusively that the head-to-toe assessment was not performed. And I believe it was also at that same time, at the September 5th meeting, that Ms. Waite conceded that she had not done a skin assessment, which I think we should point out is something that was not done by the emergency department nurse nor the night shift nurse who took over for Ms. Waite on the evening of August 28th. And neither of those nurses were disciplined for that issue, for failing to document the skin tear, which was apparently a big enough deal to warrant termination and reporting to the state nursing board. Importantly, though, given the fact there is conflicting evidence in the record on this, it's inappropriate in the Section 10J context for the district court to try and resolve these factual and credibility disputes. The ALJ found both Ms. Kress and Ms. Lesjak, two of Affinity's key witnesses on the issue of the head-to-toe assessment, not credible. Now, while credibility assessments aren't typically appropriate to review during the Section 10J context, if the board were to uphold those credibility assessments in the Section 10E or 10F enforcement action of this case, probably next year sometime, those credibility determinations would be afforded great weight. So in terms of just putting this case in perspective, the ALJ was the one who heard all the witnesses. Yes. The ALJ issued a very lengthy report. Yes. The district judge did not hear witnesses, right? The district judge did not hear witnesses. So is the district judge supposed to defer in some fashion then to the findings of the ALJ, or is the district judge supposed to look at the transcripts of testimony in front of the ALJ? The district court does not need to, nor should it probably defer to an administrative law judge's findings during the Section 10J context. But by that same point, the district court had before it the very voluminous administrative transcript, including testimony of all the witnesses who were subject to both being placed under oath and cross-examination, as well as affidavit evidence of the very chilling effect that Affinity's unlawful actions had on its employees in terms of their support of the union. The use of affidavit evidence has previously been found to be acceptable by this court in both the Harn v. Jackson and I believe it was also the other case escapes me, but affidavit testimony to demonstrate the chilling effect of employers' unfair labor practice is very typical in terms of the type of evidence that's presented during a Section 10J proceeding. Furthermore, as to that evidence of chill, I think it's important to remember, because Affinity makes some mention of this in their filings before this court, that Miss Waite was not the most prominent union supporter or somehow saying that the level of her union activity both counteracts both her unlawful discharge and reporting to the state nursing board and whether or not it's just improper to reinstate her. I think that misses the mark on a key aspect, is that when you're determining whether or not any discriminantee, one or more, should be reinstated in the Section 10J context, the real analysis is what is the chilling effect that that employee or employee's termination is having on the remaining employees. In this case, the bargaining council, after Affinity discharged Miss Waite, dropped from 40 members to 15, 10 of whom specifically stated that they were resigning from the bargaining council because they were afraid that what happened to Miss Waite, a, by all accounts, stellar nurse prior to August 2012, who was hand-picked, recruited a year prior for the orthopedic department, who had been commended by Affinity for her outstanding performance in August 2008. If it happened to her, it could happen to them. And it's not just their jobs that were on the line, but their very careers, vis-à-vis the filing of complaints with the nursing board. And I think that's... What was the span of time between the day that the entries were made in the chart, including the rounding and the wrong hour on the head-to-toe? What was the lapse of time between that day and the day that she sat down and initialed them? A little more than a week. She initialed on August 28, or she did the chart, charting on August 28, and she sat down and initialed the chart on September 5. Okay, and you said that... Let me get these dates down. That she was, when that happened, she was not told why she was being asked to do that. Is the record clear on that? Yes, it just said that they were doing a chart audit. It didn't... It didn't say, we think there's some falsification going on here. We need you to recheck this. No. Okay. Another thing that I think is important to point out is that it's not just the interim reinstatement that's important in this case for sending the clear message to Affinity's employees that they can openly support the union without fear of retaliation. But it's also that component with the complaint to the nursing board. And there's been some deal made on whether or not that's appropriate in the Section 10J context. First of all, this court in Norton Healthcare found that in a board's final order that rescission of a complaint to a state nursing board was appropriate if it was done for unlawful reasons. In the Section 10J context, any remedy that the board could get through a final order is available to the district court. And I should note, notably, that the district court did not order back pay for misweight. In other words, the district court's order is tailored to send the message to all the rest of the employees that they can engage in support of the union without fear of being unlawfully targeted. And this is just an interim order, right? It's just an interim order. When the board... This only covers the span of time until the final board order comes out. How long is that taking these days? Isn't there a backlog? There are a lot of cases that have to be re... There is a bit of a backlog, but as of, I believe, early November, there was only a few cases left before the board that were decided by the improperly constituted board that had come back down from the circuits for new decisions. The board has been getting through those rather quickly and has some past experience after a new process seal on that. It's hard to say with any sort of certainty when the final board order will come. Well, but just ballpark. We're not going to, you know, memorialize this in an opinion or something. Very soon would be my guess, but how soon soon is up for debate. The board has recently, in April and in August, issued decisions against two of Affinity's sister facilities, Fallbrook Hospital and Barstow Hospital, which had very similar violations with the exception that there wasn't a discharge. We're getting off the record now. Yeah, I know. That's a bit far afield, but it's already decided several similar cases in the pike, so this should be the next one out. Just briefly as to that ad hoc, that putative ad hoc agreement that Affinity mentioned, is it has never been demonstrated that this was an actual agreement that was signed by both parties. And to the extent that it hasn't really been raised as an argument for, and that it's being characterized as this harmonious ADR process by which the parties were addressing all their issues during the organizing campaign, that's not what governs Affinity's conduct during the organizing campaign. It is the consent election agreement. It entered with the regional director and the union on, I believe it was August 22nd of 2012. Another point I wanted to make was about the testimony that Director Osterman gave concerning that he'd never seen this combination of patient care incidents. Again, this is the sort of credibility and factual determination that's probably inappropriate in the Section 10J context, but to that matter, its probative value is, I see that my time is up. But to that end, it's a very little probative value, and the court should allow the board to determine to what extent that should be credited. Thank you very much. A few brief points, Your Honors. This circuit recognizes that there's a difference between strong union support, vocal advocacy, zealous advocacy on behalf of a union, and the kind of innocuous, everyday participation in the process that does not warrant the inference that bias, anti-union bias, animated or compelled a decision by an employer. Ann Waite's testimony in this case about what she did was, I attended a few meetings, I talked to some coworkers, and my picture's on the flyer, along with 33 others. That's it. Unlike the other cases that this court has decided where a chilling effect is inferred from the facts, for example, there was the Ahern decision, where the employer, immediately after the strike, terminated three employees, one of whom had a significant community-based presence, advocating on behalf of the union. Another two were extremely visible on the strike line. They were not offered their jobs back or returned to work. Instead, they were fired, and the court observed, this effect says, you can't strike. If you strike, we will hurt you. Well, I have to say the affidavits that were submitted are among the most interesting I've seen as a judge, because normally we get these affidavits that the lawyer on that side of the case is prepared, and they're all in the same font, and they're all, you know, the layout is all the same, and they're all very professionally done. These were clearly done personally by the nurses who actually wrote them. There are all kinds of typographical errors and corrections and all the rest of it, and it does add up to some chill evidence, don't you think? I mean, those are remarkable affidavits. They're nothing like we usually see.  that they are not sort of typical of litigation, but I would turn the court's attention to our motion to strike those affidavits because of the rank and inadmissible evidence that are contained in there, lack of personal knowledge, hearsay, no material basis for the evidence, no foundation for presented. And I think, in fact, that if you look between the lines in those affidavits, the union activity was not affected at affinity as a result of Ann Waite's termination.  Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?